

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8241 | **DATE** | 2/14/2001 |
| **CASE TITLE** | SYNDIA CORP et al vs. LEMELSON MEDICAL, EDUCATION, AND RESEARCH FOUNDATION   et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Pursuant to Memorandum Opinion and Order entered this day, plaintiffs' motion for summary judgment as to Gillette and Warner-Lambert on Counts I through IV of the first amended complaint is denied.  Defendants' cross-motion for summary judgment as to Gillette and Warner-Lambert on Counts I through IV  is granted.  Defendants' motion for summary judgment on Count V is granted.  Count V is dismissed in its entirety.  Status hearing is set for March 1, 2001 at 9:00am.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | | FEB 15 2001 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 2/14/2001 | |
| | | | | date mailed notice | |
| | courtroom deputy's initials | JS | | JS | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | |
|---|---|
| SYNDIA CORPORATION,<br>ROGER P. HICKEY, and JAMES G. CONLEY<br><br>    Plaintiffs,<br><br>  v.<br><br>LEMELSON MEDICAL, EDUCATION,<br>AND RESEARCH FOUNDATION, LIMITED<br>PARTNERSHIP, LEMELSON EDUCATIONAL<br>AND RESEARCH CORPORATION,<br>DOROTHY LEMELSON, THE JEROME<br>LEMELSON MARITAL TRUST,<br>and DOES 1-10,<br><br>    Defendants. | No. 99 CV 8241 |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On December 17, 1999, plaintiffs Syndia Corporation ("Syndia"), Roger Hickey, and James

Conley filed a first-amended complaint against defendants Lemelson Medical, Education, and

Research Foundation, ("LMERF"), Lemelson Educational and Research Corporation ("LERC"),

Dorothy Lemelson, the Jerome Lemelson Marital Trust ("the Trust"), and John Does 1-10 (unknown

persons whom plaintiffs allege directed, aided, collaborated and joined with the named defendants).

Plaintiffs' five-count first-amended complaint alleges:  breach of fiduciary obligations (Count I),

breach of Management Agreement (Count II), breach of Letter Agreement (Count III), accounting

1

of all licenses and revenues (Count IV), and declaratory judgment seeking enforcement of plaintiffs' rights in a stock repurchase agreement (Count V). Following discovery, the parties filed cross-motions for summary judgment on Counts I through IV of the first-amended complaint on the issue of the licensees granted by defendants to Gillette and Warner-Lambert, arguing that this court should interpret the contracts at issue as a matter of law and on the basis of the undisputed facts. Defendants also filed a separate motion for summary judgment on Count V of the first-amended complaint. Plaintiffs opposed that motion on the basis that there is a genuine dispute of material fact requiring a trial as to that count. For the following reasons, defendants' motion for summary judgement on Counts I-IV as to Gillette and Warner-Lambert is GRANTED, and plaintiffs' motion for summary judgement on Counts I-IV as to Gillette and Warner-Lambert is DENIED. Defendants' motion for summary judgement on Count V of the amended complaint is GRANTED.

## STATEMENT OF FACTS[1]

Plaintiff Syndia Corporation ("Syndia") is an Illinois corporation. Plaintiffs Roger Hickey and James Conley are Syndia shareholders and members of Syndia's Board of Directors. Jerome Lemelson was, prior to his death on October 1, 1997, a prolific inventor holding over five hundred United States patents, the president of defendant LERC, and the managing partner of defendant LMERF. Defendant LMERF is a Nevada limited partnership created in 1993 to "receive and own, license and otherwise exploit or develop" Jerome Lemelson's patents, including the patents at issue in this litigation. Defendant LERC is a Nevada corporation and LMERF's managing general partner. Defendant Dorothy Lemelson is the widow of Jerome Lemelson, the current president of LERC, and

---

[1] The following statement of facts comes from the parties' Local Rule 56.1(a) and 56.1(b) statements of material facts and accompanying exhibits.

the sole trustee of defendant Jerome Lemelson Marital Trust ("the Trust"), a Nevada trust.

In 1993, Hickey and Conley came to know Jerome Lemelson. Conley purportedly had expertise in developing prototypes of new products and processes based upon Lemelson's synthetic diamond inventions. The parties came to propose the formation of a new venture among the three of them. The proposed venture's mission would be to develop products and prototypes based upon Jerome Lemelson's synthetic diamond technology, and to either manufacture and sell the products, or to license others to do so. In 1994, Jerome Lemelson, Hickey, and Conley formed Syndia (an abbreviation for "synthetic diamond") Corporation. Jerome Lemelson contributed $99,000 in start-up capital.

At the time of Syndia's incorporation on November 11, 1994, the corporation issued 1,000 shares of stock, with Hickey, Conley and Lemelson each holding 333-1/3 shares. Pursuant to a "Stock Purchase and Option Agreement" ("Option Agreement"), Lemelson purchased 300 shares of Syndia from each Hickey and Conley for $450, with each Hickey and Conley retaining the option to buy back 300 shares for $450 upon Syndia's repayment of a $200,000 loan. Jerome Lemelson loaned Syndia $200,000. Lemelson promised to loan Syndia an additional $200,000, but he never did make the additional loan. Until the repurchase option was exercised, Jerome Lemelson was to have all the rights attributable to the stock, including the right to vote the stock, and the portion of Syndia's profits and losses attributable to the stock. As such, Jerome Lemelson received voting rights of 933-1/3 of the 1,000 issued and outstanding shares of Syndia stock from November, 1994 to the present. Upon Jerome Lemelson's death, Dorothy Lemelson took and currently holds 466-2/3 shares of Syndia under the Nevada community property laws. Pursuant to Jerome Lemelson's will, the Trust (of which Dorothy Lemelson is the sole trustee) took and currently holds another 466-2/3

3

shares. Both Mrs. Lemelson and the Trust hold 600 shares subject to Hickey and Conley's buy-back rights. Mrs. Lemelson has never voted her or the Trust's shares of Syndia stock, nor played any role in the management of LMERF. Mrs. Lemelson does, however, sign license agreements with third parties as president of LERC.

On November 17, 1994, Jerome Lemelson, Hickey, and Conley signed a "Management and Shareholders' Purchase and Redemption Agreement" ("the Management Agreement") which provided, among other things, that within forty-five days after the date of signing the Management Agreement, "Syndia shall enter into a written licensing agreement with [LMERF], and Lemelson shall cause [LMERF] to enter into a written license agreement [hereinafter "license agreement," "stand-alone license agreement," or "licensing agreement"] with Syndia, effective as of November 1, 1994." Pursuant to Article I, Section 1.1(a) of the Management Agreement, the license agreement was to provide, among other things, for the following:

(1)     LMERF shall exclusively license to Syndia "all right, title and interest in and to the patents" described in Exhibit A to the contract ("the Syndia patents"). The term of such license will remain effective as long as any one or more of the patents remains effective.

(2)     Syndia shall be permitted to sublicense the Syndia patents to sublicensees, all as Syndia may determine in its sole discretion.

(3)     Syndia shall pay to LMERF a royalty equal to one-half of the royalty it receives on the patents from sublicensees, as well as 5% of Syndia's gross sales of products sold or processed by Syndia using the patents.

(4)     Syndia's rights under the licensing agreement will be subject to the rights of other third parties to whom LMERF had previously granted licenses in the patents, and LMERF does not warrant the validity of the patents.

(5)     Syndia shall not be entitled to initiate any patent infringement actions with respect to any one or more of the patents without the prior consent of LMERF.

(6)     LMERF shall have the right to terminate the license in the event Syndia does not pay a stated level of royalties within the first four years of the agreement.

(7)     The licensing agreement "shall contain such other terms and conditions as Syndia and the Lemelson Foundation may reasonably agree."

The parties never entered into the licensing agreement contemplated by the Management Agreement. Hickey testified at his deposition that Jerome Lemelson (falsely) told him before his death that he had executed the separate "stand-alone" written license agreement. On February 16, 1995, Prince Hawkins, Lemelson's attorney, wrote plaintiffs a letter which stated that the "actual assignments to the patents have not yet been executed," and that Lemelson "wanted particular assurance" that if anything goes wrong with Syndia, he would get his patents back.

In negotiating LMERF's consent to suit, Jerome Lemelson also informed plaintiffs through counsel that he wanted the absolute prerogative to decide for or against litigation. Under the Management Agreement's terms, defendants have the right to withhold consent for infringement actions on the Syndia patents. Despite these conditions, plaintiffs proceeded with the venture based in part on their review of the Lemelson diamond patents, which Lemelson represented were "broad in scope," and would be worth "tens of millions" of dollars someday.

Despite the failure to formalize the licensing agreement, it is undisputed that a letter written by Jerome Lemelson and signed by him, Hickey, and Conley on April 15, 1995 ("the Letter Agreement") acknowledged and slightly modified Syndia's exclusive rights in the patents. That letter stated, in pertinent parts, that it "will serve to confirm and formalize our prior discussions and agreement regarding the independent licensing of the subject patents by me, [LMERF], or some future rights to my present and future patents, as the case may be." The Letter Agreement went on to acknowledge that LMERF was to have the right to grant covenants not to sue on Syndia patents

5

in certain limited situations incident to settlement agreements and as part of Lemelson's other patent portfolios, where in Lemelson's sole discretion, he deemed it reasonably necessary to consummate such agreements. LMERF's rights in the Syndia patents were to be limited to situations in which LMERF needed to include the covenant not to sue on Lemelson's entire patent portfolio, so as to assure the third parties that they would never be sued for infringement by Lemelson, LMERF, or any other Lemelson entity.

With this understanding in place, LMERF began to license Jerome Lemelson's patents to third parties, including Gillette and Warner-Lambert. In the licensing negotiations incident to those licenses, LMERF advised potential licensees that LMERF had no rights in the Syndia patents. Gerald Hoiser, LMERF's patent counsel, later admitted at his deposition that LMERF's statement that it had no rights in the Syndia patents was a misrepresentation (because LMERF actually did have the limited rights in the Syndia patents recognized in the Letter Agreement), but that LMERF would only grant the limited rights in the Syndia patents if the licensee would otherwise not agree to a license. In this regard, LMERF advised both Gillette and Warner-Lambert, two potential (now actual) licensees, that the Syndia patents were to be excluded from any licensing agreement with them. In the written licenses that followed, the parties excluded the Syndia patents from the scope of the licensed patents. The Gillette and Warner-Lambert agreements use substantially similar language to accomplish this purpose. The Warner-Lambert agreement grants a license to all "Licensed Patents." Licensed Patents, in turn, are defined as Lemelson patents that had issued or which were in the future issued to Lemelson as the named inventor, excepting those listed in Schedule A ("the exclusion clause"). The Syndia patents were listed in Schedule A. The exclusion clause goes on to state that the Syndia patents were exclusively licensed by LMERF as of the

effective date of the agreement, and were excluded from the agreement.

The exclusion clause is followed by an "exception to the exception clause" in the Gillette, Warner-Lambert, and other licensing agreements, however. That clause immediately follows the exclusion clause and states "provided, however, in the event and to the extent [LMERF] acquires the right to grant licenses and covenants not to sue as contemplated hereunder, such [Schedule A, including Syndia] patents shall become included in the scope of this agreement." The purpose of the clause was to provide assurance to the licensee that it would never be sued for infringement on a Lemelson patent. Since the time LMERF and licensees Warner-Lambert and Gillette entered into the license agreements, Syndia has not given back to LMERF any of its exclusive rights in the Syndia patents, nor has Syndia in any way waived obligations owed to it by LMERF.

Some license agreements between LMERF and third parties signed prior to the Gillette and Warner-Lambert licenses also contain an "information clause" which stated the "[Syndia] patents are not owned or controlled by [LMERF] as of the effective date." Louis Hoffman, an attorney representing LMERF in its licensing agreements, testified that prior to 1999, he believed that Syndia owned (had been assigned) the Syndia patents. Gerald Hoiser, LMERF's patent attorney, initially understood that all beneficial interest in the Syndia patents had been transferred to Syndia, either by way of exclusive license or assignment. In March 1999, Hoiser contacted Hoffman by telephone and informed him that Lemelson entities held large portions of stock in Syndia and that the licensing agreement with Syndia was actually a license, not an assignment. Hoiser then asked Hoffman to make changes in LMERF's licensing agreements with respect to protecting the Syndia patents. In response, Hoffman deleted the language about LMERF's lack of ownership or control from most future licenses, including the Gillette and Warner-Lambert licenses, and instead simply stated that

the Syndia patents were excluded. Fifty-nine licenses executed after April, 1999 contained the "does not own or control" language, however. Neither Hoiser, Hoffman, nor anyone else at LMERF ever consulted the Syndia Agreement in order to determine the exact nature of Syndia's rights in the patents.

The third-party licenses also contain a "covenant not to sue" clause, which states that LMERF covenants and agrees that "neither it nor any person directly or indirectly controlled by it or claiming through it will bring suit or otherwise assert a claim against licensee or its costumers before any court . . . based on or arising out of any of the Licensed Patents and within the scope of the license rights granted herein," whether such claim arose before or after the effective date of the agreements.

Representatives of LMERF testified that, in negotiating the licenses with third parties, they understood that Syndia owned rights in the Syndia patents and sought to exclude them. It is undisputed that since November 1994 and continuing to the present, LMERF would be violating its obligations to, and the rights of, Syndia if LMERF licensed the Syndia patents to any third parties outside of the limited circumstances outlined by the Letter Agreement. In addition, a representative of Warner-Lambert testified that: "Warner-Lambert has not sought or received a license for the Syndia patents from Lemelson" and that Syndia was free to attempt to license or sue Warner-Lambert on the Syndia patents. However, that same representative testified that he would not know the legal effect of the "exception to the exception" clause if LMERF had misrepresented the nature of its rights in the Syndia patents to Warner-Lambert.[2]

---

[2]There is no evidence in the record regarding Gillette's understanding of its licensing agreement with LMERF.

Plaintiffs approached Hoiser about LMERF's licensing in March 1999, and explained the nature of their rights in the Syndia patents under the Management Agreement and the Option Agreement, under which Mrs. Lemelson and the Trust held a majority interest in Syndia. In that conversation, Hickey stated that he had somehow transferred the patents to Jerome Lemelson. In response, Hoiser stated: "if you transferred title to him, then the patents are licensed [under the third-party licenses]. Why would you transfer title to him?" However, at his deposition, Hoiser testified that his statements were in error; Hoiser realized that plaintiffs had a security interest in the stock, and had not transferred the patents or Syndia stock to Lemelson out-right. Hoiser later testified that if Syndia had not transferred its rights in the Syndia patents "back" to LMERF, then the LMERF third-party licenses had not operated to "license away" the Syndia patents.

Conley and Hickey were the only directors and officers of Syndia prior to the licenses with Gillette and Warner-Lambert. At all times, Hickey and Conley have owned a minority interest of 6-2/3% of Syndia's stock, 33-1/3 shares a piece, as well as an option to repurchase 300 shares a piece, another 60% of the stock, for nominal consideration, upon Syndia's repayment of its outstanding loan from Lemelson. LMERF does not own any Syndia stock. Dorothy Lemelson holds 933-1/3 shares (93-1/3%) of the Syndia stock, alone or as trustee of the Trust, subject to plaintiffs' repurchase option, and Dorothy Lemelson is the president of LERC, which in turn is the managing partner of LMERF. Plaintiffs admit that if Dorothy Lemelson were to use her stock position in Syndia to elect a new board that would replace Hickey and Conley for the purpose of causing Syndia to terminate its licensing agreement with LMERF, she would be liable for breach of fiduciary and contractual duties owed to plaintiffs.

It is undisputed that Syndia has never tried to contact, license, or sue Warner-Lambert or

9

Gillette directly in connection with the Syndia patents prior to filing this suit. Syndia did, however, contemplate licensing opportunities in its business plans. In October 1995, while Jerome Lemelson was still alive, plaintiffs presented a licensing plan to Mr. Lemelson. He declined to approve the program, citing his poor health and desire to avoid the stress of protracted litigation likely to arise from Syndia's assertion of infringement. Mr. Lemelson also declined to permit a licensing proposal in January 1996. In March 1996, Hickey sent LMERF a "executive summary" aimed at promoting outside investment in Syndia which outlined Syndia's patent licensing program, and an accompanying memorandum requesting Mr. Lemelson to devote some time to authorizing the patent licenses. Mr. Lemelson did not do so.

After Mr. Lemelson passed away, Louis Hoffman, one of LMERF's patent attorneys, warned Hickey to ensure that all conveyances of patent rights were in order. Mr. Hoffman later testified that at the time of that conversation, he mistakenly believed that the patents were to be assigned, as opposed to exclusively licensed, to Syndia. In February 1998, several months after Lemelson passed away, Hickey wrote to Lemelson's accountant and informed him of Syndia's licensing proposals. With respect to the licensing proposal, Hickey wrote that Syndia would "need guidance from [LMERF] regarding how and whether to proceed." In that letter, Hickey also requested a copy of Syndia's licensing agreement with LMERF. No one at LMERF ever did anything in response to Syndia's request. Ann Morgan, counsel to Mrs. Lemelson, informed Hickey in mid-1998 that the family was not interested in continuing its investment with Syndia. In April 1998, Hickey sent LMERF's counsel an e-mail requesting information and assistance in order to pursue licensing negotiations with Gillette, noting that Gillette had introduced a new product which used diamond technology. In October 1998, Hickey sent another letter to Morgan, requesting licensing guidance,

noting that Gillette was using synthetic diamond technology, explaining that Syndia was evaluating its licensing opportunities, and stating that Hickey wanted to "clean up Syndia legally, so that [Syndia] can license such opportunities in due course." Morgan responded by telephone in February 1999, stating that the family did not want to have anything to do with Syndia, Hickey, or Conley, and that the family did not want to be involved in any more litigation. According to Hickey, Morgan also stated during the conversation that the Lemelson family "in no context was ever going to give us the rights that we needed to enforce -- the rights of these patents to enforce against third parties." By July 1999, Mrs. Lemelson's position was that the family should either have Syndia buy Mrs. Lemelson and the Trust out, or have the Trust and Mrs. Lemelson buy out Hickey and Conley. Hickey testified that, in addition to the family's refusal to sanction infringement litigation, he also declined to pursue licensing opportunities because Syndia did not have money (in part because the second $200,000 loan from Lemelson to Syndia was never made), there was no formal assignment of the Syndia patents, Hickey had no governance rights in Syndia, and because Syndia had no permission to sue anyone.

Plaintiffs presented "expert" testimony that both Gillette and Warner-Lambert have infringed the claims of at least three of the patents in Syndia's patent portfolio and that a separate "stand-alone" licensing agreement would be necessary to enforce Syndia's patent rights against existing and potential infringers. Plaintiffs' "expert" opined that if plaintiffs approached potential licensees without the stand-alone license contemplated in the Management Agreement, the potential licensee would not enter into a licensing agreement on the Syndia patents. Plaintiffs' "expert" also testified that LMERF's representations in certain licensing agreements that it does not "own or control" the Syndia patents are false. However, no potential third-party licensee has ever informed any of the

11

plaintiffs that plaintiffs' rights in the Syndia patents would not be recognized.

## PROCEDURAL HISTORY

Following plaintiffs' filing of the first-amended complaint, defendants filed a motion to dismiss, arguing, among other things, the failure to state a claim for breach of fiduciary duties and breach of the Management and Letter Agreements. This court denied that motion on June 6, 2000, finding that plaintiffs had adequately alleged a fiduciary duty owing to plaintiffs by virtue of the Letter Agreement, wherein Syndia reposed trust in LMERF to license its patents in limited circumstances, and the Management Agreement, from which it is clear that Syndia cannot protect its rights by way of infringement litigation without defendants' consent. Given defendants' degree of control over the Syndia patents and Syndia's inability to monitor defendants' licensing activity, this court found that plaintiffs had alleged facts sufficient to support a finding that defendants owed plaintiffs a fiduciary duty to act in their best interests. This court also found that plaintiffs had sufficiently alleged breach of contract claims against all defendants and as to all plaintiffs.

Defendants also filed motion to dismiss Count V of plaintiffs' complaint on the basis that there was no controversy because Syndia had not attempted to repay the $200,000 loan to defendants nor had Hickey and Conley attempted to pay the $450 purchase price for the Syndia stock pursuant to the Option Agreement. This court denied that motion as well, finding that a present controversy would be created by allowing plaintiffs to deposit the funds with the court while retaining their claimed interest in the money under Federal Rule of Civil Procedure 67. In so ruling, this court found: "If defendants refuse to tender the Syndia stock, the parties may need to resolve their respective rights under the Agreement in this litigation." In response, plaintiffs tendered $280,000 as repayment of the loan and purchase price for the 600 shares of stock into a bank account

established at a Chicago bank. On August 25, 2000, defendants Dorothy Lemelson and the Trust filed a motion for a final resolution of Count V, stating their intention to accept the money and assign the 600 shares to Hickey and Conley. This court entered and continued that motion for fourteen days, stating in open court: "I would expect, given the circumstances, that [plaintiffs'] response will be, 'Great, let's resolve this count.' . . . I certainly expect that once the plaintiffs have a full opportunity to examine this, they will be in agreement -- they want the stock -- and you'd like to resolve it." On September 11, 2000, plaintiffs responded to defendants' offer by stating that, because defendants had destroyed the value of the shares, they believed it to be "premature to deliver the $280,000 in personal funds . . . when substantially more than that is owed to Syndia, Hickey, and Conley." Plaintiffs proposed that resolution of Count V be delayed until the value of the tendered shares has been established by reference to Syndia's damages or rights between the parties as to the Syndia patents. This court orally ruled that the motion for a final resolution of Count V was moot on September 12, 2000, stating "I was hoping the plaintiffs would agree to this, but they don't . . . so that motion will be denied. The only way we can resolve that is by proceeding to trial or to resolve it in advance of trial." As stated earlier in this opinion, defendants have now filed a separate motion for summary judgment on Count V.

Through a series of discovery disputes, the parties moved to have discovery extended with respect to Gillette and Warner-Lambert. This court granted several of those extensions, and then separated the issues, with the agreement of the parties, under Federal Rule of Civil Procedure 42(b), limiting the issues to be resolved in the first phase of the litigation to the licenses given by defendants to Gillette and Warner-Lambert. Accordingly, the parties have moved for summary judgment solely as to whether defendants violated contractual and fiduciary duties to plaintiffs

through their license agreements with Gillette and Warner-Lambert. The parties' motions, by necessity, concern broader issues of the legal effect of the Management and Letter Agreements and language in the third-party licenses. Where necessary, this court has addressed those issues as well.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 106 S. Ct. 2548, 2553 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511.

Under Illinois law, this court must initially determine whether the Syndia license is ambiguous. See ECHO, Inc. v. Whitson Co., Inc., 52 F.3d 702, 705 (7th Cir. 1995). A contract is unambiguous if it is susceptible to only one reasonable interpretation. Independent Constr. Equip. Builders Union v. Hyster-Yale Materials Handling, Inc., 83 F.3d 930, 933 (7th Cir. 1996). Whether a contract is clear or ambiguous is a matter of law for the court, but the meaning of any ambiguity

is a question of fact for a jury. <u>Atlantic Mut. Ins. Co. v. Metron Engr. and Constr. Co.</u>, 83 F.3d 897, 901-02 (7th Cir. 1996). Extrinsic evidence is considered only if the contract itself is ambiguous. <u>See id.</u> Here, the parties have alternatively argued that the contracts at issue are unambiguous and should be decided as a matter of law and that extrinsic evidence of the parties' intent supports their respective positions. This court believes that the contracts are unambiguous and can be interpreted as a matter of law. This court also considered extrinsic evidence of the parties intent where raised by the parties in the pending motions. The only extrinsic evidence this court considered, however, was undisputed, and this court viewed that evidence in the light most favorable to plaintiffs, drawing all reasonably inferences in their favor.

## ANALYSIS

Plaintiffs argue that defendants have materially breached contractual and fiduciary duties owed to them in two ways: (1) by failing to execute the "stand-alone" licensing agreement contemplated in the Management Agreement, and (2) improperly licensing Syndia patents to "hundreds" of companies, including Gillette and Warner Lambert. Defendants respond that plaintiffs have waived the right to maintain a claim on the "stand-alone" licence by withdrawing a proposed second amended complaint which would have added that theory of recovery, and that in any event, plaintiffs have not been damaged by the failure to execute a stand-alone licensing agreement because they have all the rights contemplated by the Management Agreement, and defendants have not licensed away any of Syndia's rights to third parties.

The heart of plaintiffs' argument runs as follows. First, defendants have never executed an unequivocal conveyance of title in the subject patents to Syndia, as promised in the Management Agreement. As a result of that failure, plaintiffs' argument continues, defendants never gave up title

15

and exclusive rights in the patents. Because defendants always retained title and key rights in the patents, defendants wrongfully licensed Syndia's rights to third parties by including "exception-to-the-exception" provisions which purported to grant the third parties' rights in Syndia patents in which defendants came to have (or always had) the right to grant licenses and covenants not to sue in their licenses with Gillette, Warner-Lambert, and others.

Plaintiffs' argument fails at the premise that defendants breached the Management Agreement by not executing an unequivocal conveyance of title in the Syndia patents, and that by not conveying title, defendants also failed to convey rights to which plaintiffs were entitled. Under the plain language of the Management Agreement and the undisputed facts, plaintiffs were never promised or otherwise entitled to title in the patents, and they have received all the rights they were promised. It is undisputed that the Management Agreement contemplated that the parties would enter into a separate "stand-alone" licensing agreement, and that they never did. However, the Management Agreement does not make it defendants' sole responsibility to execute such a license. Therefore, any breach in that regard was mutual. Even if defendants did breach the Management Agreement by failing to execute the stand-alone licensing agreement, plaintiffs suffered no damage because they have received, by defendants' admissions as recognized in this court's order, an implied license which encompasses the same exclusive rights promised in the Management Agreement, and thus exactly what they bargained for. The fallacy of plaintiffs' arguments is that they were somehow deprived of "title" or exclusive rights which they were promised. A close reading of the Management Agreement demonstrates that plaintiffs have now, by operation of law and defendants' admissions, received exactly what they were promised -- an exclusive license in, but not title to, the Syndia patents.

Because plaintiffs' argument fails at its premise, the rest of their argument fails as well. It is only plaintiffs' mis-reading of the Management Agreement and misunderstanding of the effect of an implied license that makes their strained and convoluted reading of the third-party licenses possible. Plaintiffs' rights per the Management Agreement, as supplemented by the Letter Agreement, are clear, and defendants have unambiguously excluded the Syndia patents from their third-party agreements. Any ambiguity in the third-party licenses can be resolved by looking at undisputed evidence of the parties' intent, which demonstrates that all parties involved understood that Syndia owned an exclusive license in the subject patents, and sought to exclude those rights from the licenses between defendants and third parties. Finally, any misapprehension or mis-statement in the third-party licenses regarding the exact nature of Syndia's rights is immaterial because the licenses recognized and protected the fullest possible extent of Syndia's rights. As such, Syndia has not been harmed by the Gillette and Warner-Lambert licenses. If Syndia believes that Gillette or Warner-Lambert is infringing on their patent rights (rights which are uncontested by defendants and recognized by this court), their recourse is against either Gillette and Warner-Lambert, not these defendants at this time.[3]

I.     Failure to Execute a Stand-Alone License

The parties agree that, whatever patent rights were conveyed to Syndia by virtue of the Management Agreement and subsequent Letter Agreement, they were exclusive. Plaintiffs, however, contend that they were deprived of the express right to sub-license and to sue for

---

[3]Plaintiffs in fact came forward with "expert testimony" that Gillette and Warner-Lambert are infringing on the Syndia patents. This may very well be true, but the place for plaintiffs to test that proposition is in a suit against those companies, not LMERF.

infringement, rights which were to have been conveyed in a separate written instrument. Defendants counter by admitting that they do not have the right to license the Syndia patents and that, even if LMERF had an obligation to provide additional rights to Syndia, but somehow failed to do so, the remedy for that breach is to deem the rights to have been conveyed, not to reform the third-party licenses so as to divest plaintiffs of the rights they claim to hold.

Plaintiffs argue that they have been deprived of the rights they were promised in two ways. The first is a practical concern: "any minimally prudent licensee would obviously inquire as to the whereabouts of the standalone document discussed in Article 1.1, which Syndia would then of course be unable to produce." There are three answers to plaintiffs alleged harm. First is that the alleged harm of which plaintiffs complain is too speculative to form the basis for a damage claim. See Restatement on Contracts § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."). Plaintiffs have presented no evidence that any prospective licensee has declined to enter into a licensing agreement with Syndia based on concern over the lack of a stand-alone license, and admit that they have not approached a potential licensee or been turned down based on the lack of a stand-alone license. Without such information, plaintiffs cannot show that they have suffered harm with reasonable certainty. Plaintiffs' "expert" opinion as to the legal effect of the lack of a stand-alone license on Gillette, Warner-Lambert, or other licensees is insufficient to create a genuine dispute on this point. See Harmon v. OKI Systems, 115 F.3d 477, 480 (7th Cir. 1997) ("Without any evidence in the record to support that (legal) conclusion, [expert's] statement simply is not enough to get . . . to the jury."). The effect of the failure of the parties to execute a separate stand-alone agreement is a question of law for this court, not an expert witness, to determine.

The second answer to plaintiffs' practical concern is that plaintiffs do have documentation for their exclusive rights, and no formal granting of a license is necessary to give those rights effect. While the license at issue in this litigation has been termed an "implied" licence, the only thing that is "implied" about Syndia's license is that it was to take effect in the absence of a stand-alone license. The terms and conditions of the license are not "implied," but are specifically spelled out in the Management Agreement. In addition to the Management Agreement, which lays out plaintiffs' rights explicitly, they have defendants' repeated judicial admissions in this litigation that the Syndia patents have been exclusively licensed to Syndia and LMERF has no rights in the Syndia patents (save the limited rights outlined in the Letter Agreement). Plaintiffs have the statements of Warner-Lambert that Warner-Lambert does not have and never intended to acquire a license to use the Syndia patents. Plaintiffs also now have this court's finding that the Management Agreement, as supplemented by the Letter Agreement, constitutes a legally binding exclusive license to Syndia, which includes Syndia's right to sub-license the patents in their sole discretion. Thus, contrary to plaintiffs' argument, plaintiffs do not lack "a written agreement of any kind to serve along with notice of infringement or to use as the basis for an infringement action." Even if they did, however, Syndia's implied license, confirmed by the Letter Agreement, is sufficient in and of itself to create an exclusive license, and no formality is required to give it effect. Sanofi, S.A. v. Med-Tech Veterinarian Prods, Inc., 565 F. Supp. 931, 940 (D.N.J. 1983) (citing De Forest Radio Tel. Co. v. United States, 273 U.S. 236, 241, 47 S.Ct. 366, 367 (1926)). That implied license, exclusive by its terms, is good against the world, just as if it had been in writing or formally recorded. See id. at 939 ("[A] license is good against the world, whether it is recorded or not. A purchaser of a patent takes it subject to all outstanding licenses.")

The third and final answer to plaintiffs' practical concern is that any possible "harm" which flows to plaintiffs from the lack of a stand-alone license is the result of a mutual breach between defendants and Syndia. Article I, Section 1.1 of the Management Agreement provides: "Within 45 days after the date of this Agreement, Syndia shall enter into a written license agreement with [LMERF], and Lemelson shall cause the Lemelson Foundation to enter into a written license agreement with Syndia, effective as of November 1, 1994." The Agreement goes on to state that the license agreement shall contain such other terms and conditions "as Syndia and the Lemelson Foundation may reasonably agree." As such, the Management Agreement put the onus on both parties to execute the licensing agreement. Plaintiffs may not complain that defendants failed to execute such an agreement alone when it is undisputed that the parties did not enter into a stand-alone agreement nor agree to any other terms and conditions together. While plaintiffs complain that Jerome Lemelson represented during his life that the stand-alone license agreement had been executed, plaintiffs cannot contest that they did not "enter into" the stand-alone agreement by signing it or agreeing to other terms and conditions. By failing in their promised performance, plaintiffs have waived the argument that entering into a stand-alone agreement was the essence of the Management Agreement. See Christopher v. West, 409 Ill. 131, 98 N.E.2d 722, 725 (1951) ("[H]ere, neither party made a tender of performance within the ninety-day period set for the payment of the full purchase price, and such nonaction constituted a waiver and a mutual negation of the requirement that time of payment as specified thereunder was of the essence of the agreement.")

Plaintiffs' second alleged harm is a legal one -- that the promise to convey patent rights is legally distinguishable from the actual conveyance of such rights, and that only an actual conveyance

of title is sufficient to confer upon the transferee independent standing to sue or to sub-license. In support, plaintiffs cite Arachnid, Inc. v. Merit Industries, Inc., 939 F.2d 1574, 1581 (Fed. Cir. 1991), in which the court held that an agreement to assign patents to "future inventions not yet developed" did not by itself vest legal title to patents in the promisee. However, Arachnid is distinguishable from the present case on multiple levels.

First, here there is an explicit license, inferred from the Management Agreement and Letter Agreement, which grants plaintiffs the right to sub-license the Syndia patents at their own discretion.[4] As noted, that license is "implied" only as to how and when it was to take effect. Its terms and conditions are spelled out explicitly in the Management Agreement. As such, plaintiffs do not need legal tools of license construction to find a right to sub-license; they already have that right by virtue of defendants' numerous judicial admissions and the Management and Letter Agreements. Given the clear intent of the parties to convey those rights, this court deems them to have been given. In re Cambridge Biotech Corp., 186 B.R. 9, 16-17 (Bankr. D. Mass. 1995) (stating that equity deems as done that which should have been done), aff'd, 186 F.3d 1356 (Fed. Cir. 1999). As for the conveyance of title and the corresponding independent standing to sue, the Management Agreement makes clear that plaintiffs were not promised those rights, and thus have no basis to complain that they did not get them. The Management Agreement did not, contrary to plaintiffs'

---

[4]As noted by plaintiffs, Syndia's rights to "license" or "cross-license" the Syndia patents are limited by the necessity of getting authorization through its Board of Directors, which now includes Mrs. Lemelson, under Articles 1.2(i) and 1.3(i) of the Management Agreement. To the extent that limitation limits plaintiffs' ability to license the Syndia patents to third parties, the limitation was bargained for by the parties. Mrs. Lemelson is, of course, bound by fiduciary duties to Syndia to act in Syndia's best interest. Plaintiffs have not come forward with any evidence that authorization to license has been unreasonably withheld. There is thus no issue of material fact as to whether Syndia's rights to sub-license or license the patents have been harmed.

argument, promise to convey title to the patents, which would have included independent standing to sue. The Agreement does state that the LMERF "shall exclusively license to Syndia all right, title, and interest" to the Syndia patents. As such, any rights to title in the patents were to be (and are, by virtue of the implied license) "exclusively licensed," not "conveyed" or "assigned."[5] Plaintiffs even admit that the were granted rights in the Syndia patents, as recognized in the Letter Agreement. Because plaintiffs got exactly that which they were promised, they have not been harmed. Plaintiffs may not now change the agreement they previously struck with defendants. Channell v. Citicorp Nat. Services, Inc., 89 F.3d 379, 384 (7th Cir. 1996) ("[O]ne party to a contract may not unilaterally alter its terms.").

The Management Agreement also recognizes that Syndia was to have independent standing to sue under the exclusive license despite the lack of legal title, albeit limited by the necessity of obtaining consent from the LMERF. Ordinarily, only a holder of legal title may recover damages for infringement. Arachnid, Inc. v. Merit Industries, Inc., 939 F.2d 1574, 1581 (Fed. Cir. 1991) ("The general rule is that one seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the legal title to the patent during the time of the infringement."); see also Moore v. Marsh, 74 U.S. 515, 522 ("[T]he right of action is given to the

---

[5]Plaintiffs cite a litany of cases which interpreted contractual agreements on patent rights in which it was unclear whether the rights were to be licensed or assigned where the courts looked to the nature of the rights conveyed to determine whether there was an assignment of title. Here, however, the plain language of the Management Agreement contemplates an exclusive license, not an assignment of title. To the extent plaintiffs are complaining that they never received title in the patents, this court is at a loss to understand their argument, unless they are claiming that they were somehow entitled to title. The plain language of the Management Agreement states otherwise, however. Plaintiffs have never received title in the Syndia patents because they were never promised an assignment of title in them.

person or persons owning the exclusive right at the time the infringement is committed."). However, here the parties clearly intended to convey Syndia the right to sue for infringement without conveying legal title. The Management Agreement's limitation on Syndia's right to initiate patent infringement litigation, requiring prior consent from defendants, would be superfluous had the parties not intended that Syndia would have the right to sue for infringement. As such, this court finds as a matter of law that the license from defendants to Syndia included independent standing to sue, limited by the necessity of obtaining permission from LMERF.

Moreover, even if the Management Agreement did not include independent standing to sue, plaintiffs, as exclusive licensees, could simply join defendants as necessary plaintiffs in any patent infringement suit. Ortho Pharmaceutical Corp. v. Genetics Institute, Inc., 52 F.3d 1026, 1032 (Fed. Cir. 1995). A patent license may have the effect between the parties to the license of transferring the rights to exclude others from making, using or selling the invention in the United States from the patentee to its licensee. See id. Such license then does more than provide a covenant not to sue, i.e., a "bare" license; the license makes the licensee a beneficial owner of some identifiable part of the patentee's bundle of rights to exclude others. Id. A licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology provides the foundation for co-plaintiff standing. Id. Such is the case here. The Management Agreement, the Letter Agreement, and defendants' judicial admissions in this litigation all acknowledge plaintiffs' "exclusive" right to use the Syndia patents. That exclusive license grants plaintiffs the undisputed right to prevent others from making, using, or selling the Syndia patents. With that right comes co-plaintiff standing to sue for infringement in the event another (such as Gillette or Warner-Lambert) infringes the Syndia patents. Id. ("It seems clear then on principle and authority that the owner of a patent who

grants to another the exclusive right to make, use or vend the invention, which does not constitute a statutory assignment, holds the title to the patent in trust for such a licensee, to the extent that he must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to this exclusive right by an infringer or to enjoin infringement of it."). Because plaintiffs may bring suit for infringement by joining defendants as co-plaintiffs, regardless of the independent standing to sue recognized in the Management Agreement, plaintiffs still would not be harmed by defendants' alleged failure to explicitly grant plaintiffs independent standing to sue.

This case is distinguishable from Arachnid for another reason, as well. The exclusive license to the Syndia patents conveyed here was for inventions which had already been patented, and thus rights in the inventions were capable of being presently conveyed to another. In Arachnid, by contrast, the court noted that legal title to an invention can pass to another only by a conveyance which operates upon the thing invented after it has become capable of being made the subject of an application for a patent, Arachnid, 939 F.2d at 1581, such that a present conveyance of rights in a thing not yet invented was not possible. Here, exclusive rights passed to plaintiffs at the time the Management Agreement was signed, effective November 1, 1994. As recognized by the later Letter Agreement, plaintiffs were given more than a promise of rights to come; they were given present exclusive rights in the Syndia patents, including the right to use, exclusively sub-license, and sue for infringement with defendants' prior consent.

While plaintiffs complain that defendants have denied them the right to license the Syndia patents, including to Gillette, they provide no proof that they ever actually attempted to sub-license the patents, nor that defendants ever unreasonably withheld permission to license the patents or to

initiate infringement litigation on them, whether with Gillette, Warner-Lambert, or any other potential licensee. Moreover, the Management Agreement, in conjunction with the Letter Agreement, gave Syndia an implied and uncontested license in the patents. That license includes, by its terms, the right of Syndia to sub-license the patents in its sole discretion. As such, there is no basis upon which defendants could withhold permission to sub-license the patents to Gillette. Plaintiffs make much of the fact that the right to sub-license is closely tied to the right to initiate infringement litigation, and that a right to sub-license is somewhat illusory without the right to initiate infringement litigation. However, Syndia bargained for the right to initiate litigation only with defendants' consent. Defendants are bound to exercise their consent power in reasonably and in good faith, consistent with the purposes of the Syndia agreement. DeWitt Country Pub. Build. Com'n v. County of DeWitt, 128 Ill. App. 3d 11, 469 N.E.2d 689, 695 (4th Dist. 1984). To the extent defendants have the power to limit plaintiffs' licensing scheme by limiting their consent to litigation in good faith, plaintiffs have gotten exactly that for which they bargained. To the extent defendants unreasonably and in bad faith limit plaintiffs' licensing and litigation plans in the future, plaintiffs may bring suit against defendants on that basis and at that time.

In summary, plaintiffs have suffered neither a "practical" nor a legal violation of their rights. They have exactly that which they were promised under the Management Agreement -- the exclusive right to use the Syndia patents, to sub-license the Syndia patents in plaintiffs' own discretion, the right to sue third parties for infringement with LMERF's consent (consent which may not be unreasonably withheld under contractual and fiduciary duties of good faith and fair dealing), or alternatively, the right of an exclusive licensee to sue third parties for infringement by joining LMERF as a co-plaintiff in any necessary infringement litigation. As such, any claim which

plaintiffs might have stated against defendants for the failure to execute a stand-alone licensing agreement fails because plaintiffs have suffered no damage from any "breach" of the Management Agreement that may have occurred. Plaintiffs cannot claim injury stemming from defendants' failure to give them more than they bargained for.

## II. The Third-Party Agreements

Plaintiffs next argue that defendants have licensed away their rights in the Syndia patents to third parties, including Gillette and Warner-Lambert. In order to reach this conclusion, plaintiffs engage in a strained and convoluted reading of the third-party licenses which presumes that defendants never actually granted Syndia an exclusive license in the subject patents, such that defendants always maintained and never gave up the right to sub-license and grant covenants not to sue to third parties. As explained above, this court finds that defendants did give Syndia an exclusive license in the subject patents and thus gave up their rights to license and to grant covenants not to sue. Having found counter to the premise of plaintiffs' reading of the third-party licenses, this court does not, under the language of the third-party agreements, find that defendants have wrongfully licensed rights to third parties which belong to Syndia. This court nevertheless addresses the parties' arguments regarding the language of the third-party licenses in order to make clear that defendants did not license any rights in the Syndia patents to third parties.

### A. The "Exception to the Exception" Clause

Plaintiffs argue that while defendants could have properly protected Syndia's rights in the subject patents even while engaging in a licensing scheme, defendants actually licensed away Syndia's rights by including a "proviso" or "exception to the exception" clause in the third-party licenses. The Warner-Lambert "exception to the exception" clause provides: "'Licensed Patents'"

26

means all United States Patents . . . which either have issued, or which in the future may issue with Jerome H. Lemelson as named inventor, excepting only those Lemelson patent rights identified in Schedule A [which includes the Syndia patents] . . . Schedule A patents . . . are excluded from the scope of this Agreement provided, however, in the event and to the extent [LMERF] acquires the right to grant licenses and covenants not to sue as contemplated hereunder, such Schedule A Patents shall become included in the scope of this Agreement." (emphasis added) The language in the Gillette licensing agreement is almost identical. Plaintiffs argue that, because LMERF has always retained the right to grant licenses and covenants not to sue under the Syndia patents, those patents became licensed to third parties by way of the "exception to the exception" clause, just as if LMERF had "acquired" the rights back from Syndia after signing the third-party licenses.

Plaintiffs' reading of the "exception to the exception" clause, a reading which results in defendants' giving away plaintiffs' rights, is untenable for four reasons. First, the plain language of the third-party licenses explicitly excludes the Syndia patents from the third-party licenses, so no parol evidence is necessary to interpret the agreements. Second, even considering parol evidence, LMERF did not have the "right"within the meaning of the licenses and the law to grant licenses and covenants not to sue under the Syndia patents at the time it entered into the third-party licenses with Gillette, Warner-Lambert, and others. Third, even if LMERF did have the right to convey such licenses within the meaning of the "exception to the exception" clause, the Syndia patents did not trigger the clause because defendants did not "acquire" any alleged rights after signing the licenses; any "right" LMERF had to license the patents existed long before LMERF entered into the third-party agreements. Fourth and finally, even if the third-party licenses were ambiguous, plaintiffs' proposed construction of them is untenable because it violates basic tenants of contract law.

27

### 1.   The Plain Language of the Exclusionary Clause

The plain language of the main exclusionary clause makes clear that the parties to the third-party licenses intended to exclude the Syndia patents from the licenses. The exclusionary clause excludes from the "Licensed Patents" those patent rights identified in Schedule A, and the parties do not dispute that the Schedule A patents includes the Syndia patents. In fact, plaintiffs agree that, if the Syndia licenses were simply excluded without qualification or reference to LMERF's rights, Syndia's rights would not have been wrongfully licensed to third parties. As such, plaintiffs can only succeed in showing that the Syndia patents were wrongfully licensed to third parties if they can show that the "exception to the exception" clause somehow eliminated the exception, such that the patent rights which the parties plainly intended to exclude from the licenses were somehow included.

### 2.   Defendants' "Right" to License the Syndia Patents to Third Parties.

The "exception to the exception" clause of the third-party agreements passes rights that LMERF acquires to grant licenses and covenants not to sue directly to the licensee. Plaintiffs argue that defendants have the right to license the Syndia patents to third parties, such that they are included in the third party agreements by virtue of the "exception to the exception" clause. Because title in the patents never passed to plaintiffs, defendants can withhold consent from infringement litigation by Syndia, and defendants have control over Syndia by virtue of Mrs. Lemelson's majority shareholder position, plaintiffs argue, defendants have effectively retained the right to grant licenses and covenants not to sue. Plaintiffs reason that because a license is legally indistinguishable from a promise not to sue that party, and because defendants have retained the right to prevent Syndia from suing third parties for infringement, defendants have also retained the right to license the Syndia patents. Defendants respond that while they may have the "power" to license the Syndia

28

patents to third parties, they do not have the "right" to do so because they could not license the patents to third parties without violating their contractual and fiduciary duties to plaintiffs.

Again, plaintiffs' argument fails at its premise -- that by retaining title in the Syndia patents and the right to withhold consent for infringement litigation by Syndia, defendants also retained the right to grant licenses and covenants not to sue under the Syndia patents. Because defendants do not have the right to license the Syndia patents, then they do not come within the scope of the "exception to the exception" clause because that clause refers to the "right" to license the patents, not simply the raw power to do so. Plaintiffs argue that defendants have both the "right" and the "power" to license the Syndia patents to third parties because defendants would not breach the Syndia-LMERF exclusive license agreement by licensing the patents to third parties. As such, plaintiffs' argument rests on the proposition, already rejected by this court in Part I of this opinion, that defendants never gave Syndia the right to sub-license the Syndia patents. While defendants could effectively license the Syndia patents to third parties by refusing to consent to infringement litigation, they could not do so without breaching their promise to plaintiffs that Syndia shall have the exclusive right to use the Syndia patents or without breaching their fiduciary duties to act in the best interests of Syndia as 93.3% shareholders in Syndia. A "power" which may not be exercised without violating the restraints put on it by law is not a "right." As the Supreme Court explained in United States v. Byrum,

> The term 'right' . . . connotes an ascertainable and legally enforceable power . . . . Here, the right ascribed to Byrum was the power to use his majority position and influence over the corporate directors to 'regulate the flow of dividends' to the trust. That 'right' was neither ascertainable nor legally enforceable and hence was not a right in any normal sense of that term. . . . Whatever power Byrum may have possessed with respect to the flow of income into the trust was derived not from an enforceable legal right specified in the trust instrument, but from the fact that he

29

> could elect a majority of the directors of the three corporations. The power to elect the directors conferred no legal right to command them to pay or not to pay dividends. A majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests.

408 U.S. 125, 136, 92 S.Ct. 2382, 2390 (1972). Here, as in <u>Byrum</u>, defendants may have the power to license the Syndia patents to third parties by virtue of retaining title in them and the power to enjoin infringement litigation by Syndia. Defendants do not, however, retain the right, within the normal and customary meaning of the word, to do so because granting licenses in the Syndia patents to third parties would necessarily constitute a breach of defendants' contractual and fiduciary duties to Syndia. <u>See id.</u> ("The use of the term 'right' implies that restraints on the exercise of power are to be recognized and that such restraints deprive the person exercising the power of a 'right' to do so.")

Again, to the extent plaintiffs are complaining about their limited rights and defendants' retained rights in the Syndia patents without alleging breach of contractual or fiduciary duties in the exercise of those rights, this court is at a loss to understand plaintiffs' arguments. Every piece of "evidence" to which plaintiffs point regarding their limited rights is in the language of the Management Agreement itself; plaintiffs expressly bargained for and agreed to those limitations on their rights. They cannot now use those limitations to gain rights that they never bargained for.

3.    <u>The Temporal Language of the "Exception to the Exception" Clause</u>

Plaintiffs argue that the "exception to the exception" clause applies to "rights" in patents which LMERF possessed at the time the third-party licenses were signed, such that if LMERF had the right to license the Syndia patents at the time the third-party licenses were signed, those rights were transferred to the third-party licensees by way of the "exception to the exception" clause.

Defendants counter that the clause, by language and logic, applies only to the future acquisition of rights by LMERF. Because any "rights" LMERF held in the Syndia patents existed prior to the time the third-party licenses with Gillette and Warner-Lambert were signed, and thus could not be "acquired," they fell outside of the exception-to-the-exception clause.

This court agrees with defendants' forward-reading of the "exception to the exception" clause. Assuming for purposes of argument that defendants had any present "rights" (as opposed to "power") in the Syndia patents when LMERF entered into the Gillette and Warner-Lambert agreements in 1999 (an assumption this court has already rejected on the basis of the undisputed facts), they were rights which pre-dated the third-party licenses, and thus did not come within the "exception to the exception" clause because LMERF has not "acquired" any rights in the Syndia patents, nor have the Syndia patents "become" the property of LMERF since entering into the license agreements with Gillette and Warner-Lambert.

The plain language of the "exception to the exception" clauses in the Gillette and Warner-Lambert licenses speak only to future events. The Warner-Lambert provision provides that "in the event" and "to the extent" LMERF "acquires" the right to grant licenses and covenants not to sue, the Schedule A patents (including the Syndia patents) "shall become" included in the scope of the agreement. The Gillette licensing agreement contains substantially the same language. That language makes clear that Gillette and Warner-Lambert were to receive all the patent rights held by LMERF at the time of the agreement, a limited universe consisting of those patents with Jerome Lemelson as the named inventor, less those listed in Schedule A. In addition, the licensees were to receive any future rights which came to LMERF "in the event" the rights were "acquired" by LMERF. No "event" has triggered the passing of Syndia's rights back to LMERF, and LMERF

could not possibly "acquire" rights it has held all along.

The "future events only" reading of the third-party licenses' "exception to the exception" clauses matches with logic and the parties' intent, as well. LMERF intended to grant and the licensees bargained to receive licenses in all the patents LMERF held at the time, save for those in which LMERF had already granted exclusive rights, including the Syndia patents. Hence, the third-party licensees paid for and obtained a license in all LMERF had the right to give at the time of the agreement, understanding that the Syndia licenses were not LMERF's to give. In addition, the third-party licensees obtained the assurance that they would be free from infringement claims by LMERF if LMERF were to acquire rights in the presently-excluded patents some time in the future. The parties gave that assurance by providing that any future-acquired rights would pass immediately to the third-party licensees.

Plaintiffs argue that the parties could not have intended to prevent LMERF from later suing the licensees for infringement on rights they obtained some time in the future, but not on those rights which LMERF always retained (even if LMERF was not aware that it held them). While plaintiffs' argument sounds logical, plaintiffs forget that the parties to the third-party licenses undisputedly understood the Syndia licenses to be excluded from the agreements, and that Syndia held exclusive rights in those patents. As such, the third-party licensees have what the bargained for -- all Lemelson patents less those specifically excluded, including the Syndia patents. LMERF also gave what it intended to give -- all rights which it had the right to give. The reasons for the "exception to the exception" clause do not apply to the rights held by LMERF at the time of the license, because LMERF would not sue for infringement on the basis of rights it had explicitly admitted it did not own (unless and until LMERF reacquires them). Given defendants' numerous judicial admissions

in this litigation and now this court's order, defendants could not possibly sue the third parties for infringement on the Syndia patents; they have admitted that they have no rights in them. As such, the purpose of the "exception to the exception" clause is served by this reading. The third-party licensees are free from the threat of litigation by LMERF because LMERF has acknowledged that it does not have the right to grant licenses or covenants not to sue under the Syndia patents. If LMERF were to re-acquire Syndia rights in the future, they would become immediately licensed to the third-party licensees, so that LMERF also could not sue them on the basis of rights it did not have at the time of the agreement but now holds. That is the precise result is contemplated by the "exception to the exception" clause.

4. "Exception to the Exception" Clause under Principals of Contract Interpretation

It is abundantly clear from the forgoing that plaintiffs' interpretation of the "exception to the exception" clause is convoluted, strained, and contrary to the plain language of the license. In addition to these problems, defendants properly note that plaintiffs' interpretation of the "exception to the exception" clause violates numerous principals of contract interpretation, among them: (1) an exception cannot be read to swallow the rule, Woods v. Elgin, Joliet & Eastern Railway Co., No. 96 C 6819, 2000 WL 45434, at *5 (N.D. Ill. Jan 11, 2000) (reasoning that it is a basic contract principle that the meaning of separate contract provisions should be considered in light of one another, and that exceptions should not be read to swallow the rule); (2) every term must be given meaning, and the contact cannot be construed to render one provision meaningless, Lukasik v. Riddell, Inc., 116 Ill. App. 3d 339, 452 N.E.2d 55, 60 (1st Dist. 1983); and (3) confronted with two conflicting constructions, a court must adopt the one that preserves rather than infringes another's

legal rights, <u>Srivastava v. Russell's Barbecue, Inc.</u>, 168 Ill. App. 3d 726, 523 N.E.2d 30 (1st Dist. 1988).

As such, even if this court were to conclude that the Gillette and Warner-Lambert licenses are ambiguous and did not expressly exclude the Syndia licenses, such that principals of contract interpretation are necessary to resolve the ambiguity, this court could not accept plaintiffs' reading of the contract. First, plaintiffs' reading of the "exception to the exception" clause would swallow the rule by including patent rights that the exclusion clause plainly intended to exclude. For the same reasons, plaintiffs' reading of the "exception to the exception" clause would render the exclusion clause meaningless. Finally, plaintiffs' reading would require this court to read the third-party licenses so as to infringe upon plaintiffs' rights by finding that their rights have been licensed away, rather than to protect plaintiffs' rights by finding that they were excluded from the third-party licenses.

### 5. Conclusion on "Exception to Exception" Clause

For all of these reasons, Syndia's rights in the Syndia patents did not pass to third parties, including Gillette or Warner-Lambert, by way of the "exception to the exception" clause. Because the Syndia patents are not "Licensed Patents" within the meaning of the third-party contracts, LMERF has not granted the third parties a covenant not to sue on the Syndia patents. This is so regardless of LMERF's ability to control Syndia, for the covenants not to sue only promise that LMERF will not sue on "Licensed Patents" within the meaning of the licenses or other patent rights included in the licenses, which the Syndia patents are not. Equally irrelevant is Warner-Lambert's statement that it did not know the effect of the "exception to the exception" clause if LMERF's representations concerning its rights in the Syndia patents turned out to be false. This court has

found that LMERF's representations of its rights were perfectly accurate, so that Warner-Lambert's uncertainty does not create a genuine dispute as to the effect of the "exception to the exception" clause.

B.    "Information" Clauses of Third-Party Licenses

In addition to the "exception to the exception" clauses of the third-party licenses, plaintiffs argue that the information clauses contained in the third-party agreements materially misrepresent Syndia's rights to the third parties, rendering the exclusion clauses invalid, thereby licensing the Syndia patents to third parties as part of the "Licensed Patents." The information clauses are placed between the main exclusion clause and the "exception to the exception" clause. The information clause in the LMERF/Warner-Lambert licensing agreement states: "The Schedule A patents [which includes the Syndia patents] are exclusively licensed by [LMERF]." The corresponding clause in the LMERF/Gillette license states: "[LMERF] does not have the right to license the Schedule A patents." Plaintiffs argue that the Syndia licenses were not exclusively licensed and that defendants did in fact have the right to license the Syndia patents because defendants retained title in them and limited Syndia's right to sue for infringement, such that the information clauses are material misrepresentations negating the exclusion clauses. This argument fails for many of the same reasons as plaintiffs' arguments that defendants had the "right" to license the patents. As established through the Management Agreement, Letter Agreement, defendants' judicial admissions, and now this court's order, LMERF did convey an exclusive license in the Syndia patents to Syndia, such that Syndia held an exclusive license and LMERF had no right to license the patents. As such, there was no misrepresentation in the information clauses.

Even if the information clauses were or are incorrect, the "misrepresentation" would not be

material. First, the information clause does not grant any rights itself, and it does not purport to modify or condition the operation of the exclusion clause, which excludes the Syndia patents explicitly. Second, LMERF and Warner-Lambert agree that the Syndia licenses were meant to be excluded; LMERF did not want to violate what they understood to be Syndia's exclusive rights in the patents, and the third parties did not want to tortiously induce LMERF to do so. Finally, in light of the undisputed evidence of the parties' intent and the only reasonable interpretation of the third party licenses, no court would reform the licenses so as to grant Warner-Lambert, Gillette, or any other licensee rights in the subject patents in which it is clear that Syndia has an exclusive license.

C. "Owns" or "Controls" Language in Some Third-Party Licenses

Plaintiffs also argue that the Syndia licenses were given to some third parties by way of a clause with stated the "[Syndia] patents are not owned or controlled by [LMERF] as of the effective date." Plaintiffs argue that because defendants retained legal title in the Syndia patents and retained the right to enjoin infringement litigation by Syndia, defendants either own or control the patents. As such, plaintiffs argue, those third party licenses whose exclusionary language is premised on LMERF's purported lack of ownership or control included the Syndia licenses because LMERF actually retained ownership of legal title to them and control over Syndia's infringement litigation. However, defendants did not "own or control" the right to license the Syndia patents for the same reasons they did not retain the "right" to license them; they could not license the patents to third parties without violating their contractual and fiduciary duties to plaintiffs.

While defendants clearly retained, and thus "owned" title in the Syndia patents, they did not "own" the right to license the patents nor did they retain the right to "control" the licensing of the patents. As such, the statements contained in some of the third-party licenses that defendants do not

own or control the Syndia patents is accurate. Furthermore, even if LMERF could "control" the licensing of the Syndia patents by virtue of Mrs. Lemelson's position as a majority shareholder in Syndia, Mrs. Lemelson (and thereby LMERF) is constrained to act within the best interests of Syndia in exercising that control. Finally, even if the statements are technically inaccurate by virtue of defendants' ability to control Syndia, such that the provision is false, it is still not materially false. The undisputed evidence makes clear that parties to the third-party licenses understood that defendants did not own or control licensing rights in the Syndia patents, that the third parties never believed they were acquiring rights in the Syndia patents, and that the third-party licenses exclude them. As such, it is undisputed that LMERF does not "control" the rights at issue in this litigation. Even if ownership and control were unclear at the time the parties entered into licenses which contained the "own or control" language, defendants' admissions and this court's order now make very clear that plaintiffs have the exclusive right to sub-license the Syndia patents, and thus "own" and "control" those rights, consistent with the terms of the licenses.

For all the reasons stated, and based upon the undisputed facts, the third-party licenses to Gillette and Warner-Lambert did not "give away" Syndia's rights in the patents.

D.      LMERF's Inability to License the Syndia Patents to Third Parties as a Matter of Law

Separate and apart from the fact that defendants factually did not license Syndia's patent rights to third parties, as demonstrated by looking at the third-party licensing agreements and the Syndia exclusive license, defendants could not, as a matter of law, have granted to any third parties rights greater than they held themselves. Because defendants did not have the right to sub-license or use the Syndia patents themselves, they could not have passed such rights to any third parties, including Warner-Lambert and Gillette. Again, plaintiffs' only retort to this argument is that, under

37

the terms of the Management Agreement and implied license, defendants did have the right to license the Syndia patents because the patents were never properly licensed to Syndia. And again, plaintiffs' argument fails because the implied license recognized by this court gave Syndia an exclusive license to use and to sub-license the Syndia patents. As such, any subsequent licenses in the same patents which defendants could have possibly granted to Gillette and Warner-Lambert as a factual matter are subject to the Syndia licenses, and if they were to conflict, the Syndia licenses would prevail as a matter of law. Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc., 565 F. Supp. 931, 220 (D.N.J. 1983) ("Where two licenses conflict, the first prevails, even though the taker of the second had no notice of the existence of the first.") (quoting 4 Deller's Walker on Patents § 401 (2d ed.); New York Phonograph Co. v. Edison, 136 F. 600 (S.D.N.Y. 1905), aff'd, 144 F. 404 (2d Cir. 1906)). The implied license to Syndia granted Syndia the exclusive right to use the subject patents. As such, any license to use the patents granted to Gillette or Warner-Lambert would be ineffective as a matter of law. See id. (stating that even if second licensee did have a valid license, it would still be subject to the first license).[6] Because any rights which defendants might have inadvertently passed to the third parties by virtue of the "exception to the exception," "own or control," or information clauses would be subservient to plaintiffs' rights in the Syndia patents as a matter of law, plaintiffs' rights under the exclusive license with LMERF are fully intact. As such, plaintiffs have suffered no injury, even if the Syndia patents were inadvertently licensed to third parties, which

---

[6]Plaintiffs attempt to distinguish Sanofi on the basis that there had been a proper transfer of title in the patent to the first licensee, whereas in this case title never passed. Plaintiffs' characterization of Sanofi is flatly wrong. Sanofi concerned the rights of a prior exclusive licensee as to a second licensee, precisely the case here. Plaintiffs hold an earlier exclusive license in the Syndia patents, and Gillette and Warner-Lambert are claimed (by plaintiff only) to be subsequent licensees.

they have not been.

III.  <u>Causation for Plaintiffs' Alleged Injuries</u>

Finally, defendants argue that plaintiffs cannot state a claim for injury flowing from defendants' failure to deliver a stand-alone license and allegedly licensing away plaintiffs' rights in the Syndia patents because plaintiffs cannot show causation for any injury. Plaintiffs claim injury in the form of denied licensing opportunities to Gillette, Warner-Lambert, and others. Defendants argue that plaintiffs cannot claim such injury without first approaching prospective licensees, including Gillette and Warner-Lambert, and then showing that their efforts were rebuffed by those licensees. Plaintiffs admit that they have never been rebuffed by a prospective licensee on the basis of an LMERF license, but claim that they are excused from making such an effort because they are unsure of their own rights in the Syndia patents, and do not believe the patents were ever exclusively licensed to Syndia. As such, plaintiffs argue, it would be bad faith to initiate legal action against Gillette or Warner-Lambert.

Plaintiffs' argument again fails at its premise. This court has recognized, defendants have admitted, and one licensee (Warner-Lambert) has acknowledged that it has no rights in the Syndia patents. Plaintiffs have a perfectly valid basis upon which to approach prospective licensees regarding licenses for the Syndia patents. As such, plaintiffs have failed to show that approaching Gillette, Warner-Lambert, or any other licensees would be futile -- i.e., that a demand would invariably be rejected by the party to whom it was addressed. <u>United Industries, Inc. v. Eimco Process Equipment Co.</u>, 61 F.3d 445, 449 (5th Cir. 1995) ("United's evidence of futility is too speculative to withstand summary judgment. United's evidence amounts to nothing more than a pessimistic belief that it was not worth attempting to compete. Because United fails to raise a

39

material issue of fact concerning causation . . . the district court properly granted summary judgment on United's antitrust claims.") (citing Out Front Productions, Inc. v. Magid, 748 F.2d 166, 172 (3rd Cir. 1984)). Because plaintiffs have not shown any actual harm in the form of licensees using their subsequent license agreements with LMERF to rebuff plaintiffs' licensing demands, and because plaintiffs have not excused this deficiency by showing that demand would be futile, plaintiffs have not shown causation as a matter of law.[7]

In summary, even if plaintiffs could show a breach of the implied exclusive license by defendants, which this court has concluded they cannot, plaintiffs still cannot survive summary judgement because they have not raised a genuine dispute of material fact as to whether any alleged breach caused injury.

IV.    Count V: Stock Repurchase Agreement

As detailed in the statement of facts, Hickey, Conley and Jerome Lemelson entered into a stock purchase agreement at the formation of Syndia. In that agreement, Mr. Lemelson purchased 300 shares of Syndia stock each from Hickey and Conley, each for $450. The parties agreed that after Syndia repaid any outstanding loan to Mr. Lemelson, Hickey and Conley would have the right to repurchase the shares for the same $450 ("Option" or "Repurchase" Agreement). Prior to his death, Mr. Lemelson loaned Syndia $200,000, but never loaned Syndia an additional $200,000 promised to Syndia. That $200,000 loan remains unpaid. In Count V of their first-amended complaint, plaintiffs seek a declaratory judgment to implement their buyback rights under the Option

---

[7]Again, plaintiffs' "expert" testimony that a potential licensee would find the implied agreement to be ineffective is insufficient to create a genuine issue of fact regarding causation. Plaintiffs cannot defeat summary judgment by presenting a legal opinion regarding the likely effect of facts establishing an implied agreement in lieu of an actual attempt to license the patents.

Agreement. As detailed in the procedural history of this case, plaintiffs tendered the repayment of the Syndia loan and the purchase price to defendants by way of a deposit with the clerk of court pursuant to Federal Rule of Civil Procedure 67. Defendants responded by offering to assign the stock. Defendants now move for summary judgment on the basis that there is no controversy because they have offered to do exactly what Count V seeks. Plaintiffs replied that they made the repurchase tender with the understanding that they had a license they could use against other companies and without knowledge that defendants have given away the patents to hundreds of companies. Now, according to plaintiffs, a live controversy still exists because plaintiffs do not know the current value of the Syndia stock, and that they should not be forced to exercise their rights under the Option Agreement until this court has settled the parties' other disputes. Because Count V is "necessarily intertwined" with the claims in the other four counts of the first-amended complaint, plaintiffs argue, this court should not dismiss Count V until the other claims are resolved.

This court agrees with defendants that Count V must be dismissed. Given the present state of the undisputed facts, this controversy is in a very different posture than when this court confronted it in defendants' motion to dismiss. At that time, this court found that a present controversy would be created if plaintiffs tendered the loan repayment and purchase price, and then defendants refused to tender the stock. Instead, the opposite has occurred. Defendants tendered the stock, showing that they were willing to assign the stock exactly in accordance with the Option Agreement. Plaintiffs attempt to create a controversy by now arguing that their rights under the Option Agreement depend upon the value of the stock. That is not the case. Plaintiffs sought declaratory judgment, seeking to enforce their rights under the Option Agreement. Defendants have offered all that plaintiffs are entitled to under that Agreement and Count V; plaintiffs do not even allege that they are entitled to

41

more than to buy back the stock at the stated price, with repayment of the loan. As such, the controversy regarding the stock repurchase agreement is moot. See Holstein v. City of Chicago, 29 F.3d 1145, 1147 (7th Cir. 1994) (dismissing declaratory judgment action on mootness grounds because defendant had offered to pay plaintiff all the damages plaintiff sought).

This is not to say, as plaintiffs argue, that plaintiffs will be forced to exercise their stock repurchase rights. If plaintiffs no longer believe that repaying the Lemelson loan and reacquiring the stock for nominal consideration is in their best interests, they may withdraw their tender offer. This court is merely holding that there is no actual controversy between the parties because defendants have clearly demonstrated their willingness and ability to offer the exact relief that plaintiffs seek. Defendants are not, as plaintiffs phrase it, moving "to obtain release of $280,000" deposited by plaintiffs with the clerk of court. Defendants are simply moving to dismiss the declaratory judgment; what plaintiffs do with the $280,000 is up to them. Plaintiffs may not create a controversy by adding terms and conditions to the repurchase which are not contained in the Option Agreement.

## CONCLUSION

For all the reasons stated, plaintiffs' motion for summary judgment as to Gillette and Warner-Lambert on Counts I through IV of plaintiffs' first-amended complaint is DENIED. Defendants' cross-motion for summary judgment as to Gillette and Warner-Lambert on Counts I through IV is GRANTED. Defendants' motion for summary judgment on Count V is also GRANTED. Count V is dismissed in its entirety. The parties are once again strongly encouraged to discuss settlement

42

of this case in light of this court's ruling. This case is set for report on status on March 1, 2001 at 9:00 a.m.

ENTER:

JAMES F. HOLDERMAN
United States District Judge

DATE: February 14, 2001